## Thomas Joyce v. Morris L. Williams.

*Adjoining owners: Division line: Acquiescence: Estoppel.* Where two parties, who have together purchased a lot, procure the same to be surveyed for the purpose of establishing the boundaries of the lot, and of dividing the same in halves, and thus make a practical and actual division of it, and both occupy and make improvements upon their respective halves, with reference to such division, a long acquiescence in such division line, though not sufficient to create a bar under the statute of limitations, will work an estoppel.—*Smith v. Hamilton,* 20 *Mich.,* 433.

*Adjoining owners: Division line: Acquiescence: Grantees.* And the case stands precisely the same between the grantees of such respective owners as if the occupation and acquiescence had been continued by the owners themselves, who originally established the division line.

*Heard October 29.    Decided January 8.*

Appeal in Chancery from Wayne Circuit.

*Theodore Romeyn,* for complainant.

*George H. Prentis,* for defendant.

CHRISTIANCY, CH. J.

This was a bill in the Wayne circuit court in chancery to establish the boundary between the easterly and westerly halves of lot number two, in block thirty, on that part of

the "Cass farm," so called, lying between Fort street and Michigan avenue, in the city of Detroit.

The north half of this block consists of six lots, all fronting northwardly on Howard street, beginning at the east side with number one (at the corner of Second and Howard streets), and numbering westwardly, two, three, four, five, and six (the latter being at the corner of Third and Howard streets). By the recorded plat, these lots were each fifty feet front on Howard street, and extending, of the same width, one hundred and thirty feet back, southwardly, to an alley.

Complainant owns the east half, and defendant the west half, of this lot two. Both parties derive title from General Lewis Cass, the proprietor of the plat,—complainant by a conveyance directly from him, the defendant through a deed from General Cass to John Martin, and thence, by several mesne conveyances, bringing the title down to himself.

Complainant first took a contract for the purchase of the whole lot from General Cass, in the winter of 1848 and 1849, or 1849 and 1850, but Martin, who was the brother-in-law of complainant, was equally interested in the purchase. Both soon after went into possession, and built a double kitchen, divided in the middle by a partition, intending the same for two kitchens, one for each, for the dwelling house which each intended to build in front, Martin himself building both, and complainant paying him for one half. Before erecting the kitchens, Martin procured a surveyor, with the assent of complainant, to locate and divide the lot into eastern and western halves, so that one could have one half and the other the other, but, as yet, it was not determined which should have either half. Complainant was not present at this survey, but assented to the division on subsequently seeing the stakes. Martin, in

building the kitchens (both of which had the same continu-
ous roof), placed the partition (made of studding, and
lathed and plastered on both sides) directly on, and along,
this dividing line between the two halves of the lot, the
center of the sill of the partition corresponding with the
line of division, as thus ascertained. Soon after the kitchens
were up, Martin also built, for himself and complainant, a
division fence between the two halves of the lot, extending
from the kitchen back to the rear of the lot on the alley,
and, not long after this, took down a piece of the fence
next the alley and built his barn there, the easterly end of
which corresponded with the fence, and thus formed part
of the division line.

When the two kitchens were completed,—which seems *to*
have been some time in August, or forepart of September,
1850,—Martin offered complainant his choice of either the east
or west half of the lot and the kitchen (or half of the double
kitchen) thereon; complainant chose the east half and east-
ern kitchen, and Martin took the west half and west
kitchen; and the original contract for the whole lot was
either surrendered and a new one taken by each from Gen.
Cass for his half of the lot, or some such arrangement was
made, so that the conveyances were afterwards made separ-
ately to each, of his respective portion of the lot, Martin
taking a deed for the west, and complainant for the east
half.

Complainant moved into his kitchen on the east half,
in August, 1850. In June 1851, he commenced building
his house in front of his kitchen, and fronting on Howard
street; but before doing so, wishing to be sure of the line,
he procured Mr. Mullet, the same surveyor who had orig-
inally surveyed the plat for Gen. Cass, to come and survey
the lot, which he did with the knowledge and consent of
Martin, putting down a stake in front on the dividing or

center line, which corresponded with the line as previously ascertained and fixed by Martin, or the surveyor first employed by him, and on which he had already placed the partition between the kitchens; and no alteration of the division line was required to be made in consequence of this survey.    It is not entirely clear that Mullet, at this time, fixed the line of division at the rear of the lot; but this is quite immaterial, as the division fence was then standing on the line previously established between them, and no alteration was claimed or required by either. Complainant then proceeded to erect the front, or main building of his house, placing the west part of it along the division line, so that the base board or water table on the outside should come just up to the line as it had thus been ascertained by the surveyor, and adopted by him and Martin; and Martin, soon after, either the latter part of the same year, or the forepart of the next, commenced building his house in front of his kitchen, and immediately adjoining the house of complainant, the roof between the two, where they adjoined, being made water tight.    This house was soon after finished, and Martin continued to reside in it with his family some five or six years; and complainant has continued to reside in his, down to this time, occupying his portion of the lot according to the division so made between them.    And neither Martin nor any of the three subsequent owners of the west half (prior to defendant) ever disputed the correctness of the division line.    The defendant, after his purchase in April, 1869, was the first to question it.    He, soon after his purchase, procured two surveys to be made of the lot, one by Mr. Robinson, the city surveyor, and one by Mr. Munro, both, doubtless, very competent surveyors.    These surveys, which agree mainly with each other, locate the entire lot (two) about six inches farther east than previously located by

complainant and Martin, or the surveyors employed by
them as already explained, placing the west line of the lot
(between two and three) six inches farther east than the
division fence between those lots, always recognized as the
true line by the owers of lot three, and extending the east
line of lot two six inches farther east than the owners of
lot one claimed it to be; and making the dividing line
through the center of lot two, six inches at the front
of the lot, and about eight inches in the rear, farther east
than the division made and recognized by complainant and
Martin, and cutting off some six inches (and in some places
a little more) of complainant's house.

In making this survey, these surveyors seem, from their
testimony, to have adopted the distances given upon the
plat, as absolutely correct, without reference to the actual
original survey upon the ground, or the stakes there, as
determining the line, and without any reference whatever
to the actual and practical location of lots, division fences,
buildings or streets, however long recognized or acquiesced
in.    And assuming their standard as the true one, we see
no reason to doubt the correctness of their survey.    And,
as surveyors have no right to determine judicially, when
lines have become fixed and binding upon parties by their
own acts or acquiescence, they may, when the original stakes
or marks of the original survey are gone, and cannot be
otherwise ascertained, be compelled to adopt such a stand-
ard as they seem to have done in this case; leaving it for
courts and juries to determine the effect of evidence tend-
ing to show where the original lines were, as well as the
effect of the acts and acquiescence of parties, or public
authorities.    But this mathematical correspondence of lines
and distances indicated upon a plat, if adopted in law as
necessarily the true, and only true one, without reference
to the actual original lines upon the ground, or to the

actual and practical location of lots, streets or buildings, however long acquiesced in and recognized, would, it may be safely asserted, disturb the boundaries of most of the lands in the state, and of many lots in the city of Detroit and other cities.    And we are not entirely satisfied from the evidence, that these surveys made for the defendant, more nearly approximate the original lines of the lots upon the ground, than the practical location of the lot made by complainant and Martin, with the aid of the surveyors employed by them.    We do not think it clearly established by the proof, that the original survey of this plat agreed mathematically with the plat as drawn and recorded.

The recent survey made for complainant by Wilmarth, the county surveyor, tends to show the correctness of the location of this lot by the surveyors formerly employed to survey it for Martin and complainant, and the substantial correctness of the line of division made and recognized by them.    And he also testified, and there was no evidence to the contrary, that, taking the long recognized locations of Second and Third streets as correct, the north side of this block along Howard street has an excess of frontage of six inches, which, if thrown into lot one, would locate lot two, six inches farther west than Munro and Robinson now place it. This also would agree with the long recognized division line between this lot and lot three, and with the location of the west line of lot one, as claimed by the owner of that lot, and generally admitted by complainant.    But we do not deem it necessary, for the proper disposition of this case, to determine which survey is correct, or most nearly approximates correctness, nor whether the original survey upon the ground when the plat was made,—if that could be definitely and certainly ascertained,—or the recorded plat, should govern, when the correctness of the location is alone in question.    As between complainant and Martin, there was

a practical location, both of the lot. as a whole, and of the division between the east and west halves of the lot. It is entirely clear from the evidence, that, with the honest intention and purpose of making a correct location of the lot, and ascertaining the true. line of division between the two halves, they did, with the aid of the surveyors employed by them, make a practical and actual division of it, by which they intended to be bound; and both proceeded to act, and continued to act, and spend their money in making improvements on the faith of it. And, if not originally bound by it, these subsequent acts and improvements, and continued occupancy on the faith of it, and the continued acquiescence in the limits established, rendered the division thus practically made, not only morally and equitably, but legally binding upon them, and all claiming under them, or either of them.

This acquiescence is clear and undisputed, first on the part of Martin, who was the more active party. in the first establishment of the line of division, and subsequently on the part of his grantees; and it is equally clear on the part of complainant. The case stands the same in all respects as if Martin himself had continued to own, occupy, and to acquiesce in the line down to this time, and had now, instead of the defendant, sought to disturb the line thus established. The defendant, claiming through him and his grantees, stands only in his and their rights, and is bound by his acts, and his and their acquiescence, to the same extent that he and they were bound.

The case falls clearly within the principle decided by this court in *Smith v. Hamilton, 20 Mich., 438.* And we think the defendant as completely barred by this practical location and this long acquiescence, as he would have been .had he ratified it by his own deed; though the period is slightly short of the twenty years at that time fixed by the

statute of limitations, and then required to establish an adverse possession, which would bar a right of action for real estate.    This conclusion rests upon a plain principle of justice, wholly independent of the statute of limitations, or any principle adopted in analogy to such statutes.

But the defendant, trusting to the correctness of the surveys which he had procured to be made, and ignoring all other considerations, insisted upon the establishment of the line in accordance with them, and called upon the complainant to remove his house six inches farther east, according to this newly established line; and wishing to move his own house, he proceeded to cut the kitchen in two upon the partition dividing them, leaving, however, the studding of the partition still standing upon what he claimed to be his part of the lot; moved his own kitchen; tore down the division fence which Martin had originally erected there, and proceeded to erect an addition to his house, in the rear of the same, extending some three or four inches eastwardly beyond the line as established by complainant and Martin.

The defendant claims, that after he had procured the survey by Robinson, complainant agreed that if he would get Munro to survey it also, and his survey should agree with Robinson's, he would then accede to its correctness, and move his house to agree with the line so established, and that after Munro's survey was made, complainant agreed to remove his house east of the new line, if defendant would side up the kitchen for him on the west side, which had been left bare by the removal of defendant's portion, and that he did side up the kitchen as agreed. But we do not think the evidence establishes either of the agreements claimed, and we think the weight of the evidence is the other way.    All it satisfactorily shows is, that the two surveys made for the defendant, had somewhat shaken complainant's confidence in the correctness of the

line of division adopted and acted upon by him and Martin, and seeing the defendant determined to insist upon the new line, he began to think he might possibly be compelled to move his house accordingly; and having already contemplated moving it farther back from the street, he went so far as to enquire of a man engaged in that kind of work, the cost of removing it farther back from the street, and farther east at the same time; but finally concluded not to remove it at all. Had he, however, made such agreement with a third person, we are at a loss to perceive what effect it could have upon this case, or how the defendant could derive any benefit from such agreement. And as to defendant's siding up complainant's kitchen for him, upon an agreement of complainant that, in consideration of his so doing, he would remove his house, complainant insisted that the defendant was bound to do this, because he had, by cutting the building in two, left the side open. And, to say nothing of the want of an adequate consideration for such an agreement, it is very questionable whether such an agreement, if proved, could be enforced under the statute of frauds.

The decree of the circuit court in chancery must be reversed, and a decree of this court must be entered for complainant, establishing the line of division between his portion of the lot and that of defendant, according to the practical location of the same, made between him and Martin, and the subsequent occupancy down to the time of defendant's purchase. This line will be defined as follows: Beginning on the south line of Howard street, at a point where the west line of complainant's house (taking the outside of the base board or water table of the main building, as it stood at the time of the filing of the bill, as the line) would, if extended, strike said south line of the street; extending thence southwardly, along the outside of said base

board or water table, to the rear or southwest corner of said main building; thence, in the shortest straight line, to the centre of the northerly end of the sill of the partition between the two kitchens, as laid down by said Martin; thence along the center of said sill, southwardly to the rear of said kitchen; thence in a straight line to the outside of the northeast corner of the barn on defendant's lot, as the same stood at the time of defendant's purchase; thence along the east side (outside) of said barn to the southeast corner thereof, and thence in the same direction to the alley in the rear of said lot; that defendant execute to complainant a release of any and all claim to so much of said lot two as lies east of the line last described, or a deed declaring and affirming said line as the true line of division between his portion of said lot and that of complainant; that complainant and defendant respectively have ——— months from the date of this decree to remove such part of their respective building or buildings, or other erections or improvements, as may now extend over said line onto the portion of said lot belonging to the other, neither doing any unnecessary damage or injury to the property of the other, in making such removal.

Complainant must recover his costs in both courts, and the record must be remitted to the court below, for the execution of this decree.

The other Justices concurred.