[Civil No. 190. Filed September 26, 1887.]

[S. C. 15 Pac. 37.]

W. A. DALTON et al., Plaintiffs and Appellants, v. LOR-
    ENZO RENTARIA et al., Defendants and Respond-
    ents.

1. IRRIGATION—ESTOPPEL BY CONDUCT.—Parties will not be permitted to stand by for sixteen years or more and see new fields brought into cultivation and improvements made under circumstances which showed that the persons making them believed they had an equal right to the use of water and then be heard to complain. Acquiescence, or non-action, for so long a time gives consent.

2. APPEAL AND ERROR—REVIEW OF EVIDENCE TO SUPPORT FINDING—NEW TRIAL—OBJECT OF MOTION FOR.—Where the evidence is sufficient to support the finding, or where the evidence is conflicting, although it may greatly preponderate against the finding, the appellate court will not, at law, interfere; where, however, in equity, the evidence is clearly insufficient, or where there is no evidence at all, it is otherwise. The object of a motion for a new trial is to enable the appellate court to look into the evidence to see if it be sufficient to support the finding.

3. ARMY AND NAVY—COURTS MARTIAL—JURISDICTION OVER CIVIL

RIGHTS—EVIDENCE—OFFICIAL MAP.—An official map, purporting to determine water privileges, made by order of a military governor, is not admissible in evidence. A military officer has no authority to exercise judicial functions, outside of military affairs, nor to authorize others, not otherwise capacitated, to determine the civil rights of a citizen. Martial law may enforce order, but has no jurisdiction over property rights.

4. APPEAL AND ERROR—OBJECTIONS TO PLEADINGS CANNOT FIRST BE RAISED IN APPELLATE COURT.—Criticisms will not be made, or objections raised, to a pleading for the first time in an appellate court.

5. IRRIGATION—ESTOPPEL IN PAIS, AND TITLE BY LIMITATION AND PRESCRIPTION SIMILAR.—With reference to the rights acquired in the use of water, estoppel in *pais*, and title by limitation and prescription, are very similar; and the latter two, to real estate, are practically synonymous.

6. TRIAL—FINDINGS UPON MATTER NOT IN ISSUE VOID.—A finding, both of law and of fact, made upon issue not raised by either complaint or answer error; it is *coram non judice*.

7. IRRIGATION—EVIDENCE AS TO PRIOR RIGHT DISTINGUISHED FROM EVIDENCE AS TO PRIOR USE.—The evidence shows that the defendants had the prior right yet the plaintiffs had the *use* of said waters. Most of defendants' testimony was as to *prior right* and not as to *prior use* of said water.

8. IRRIGATION—PRIOR RIGHT TO USE OF WATER BARRED BY ADVERSE USER—DISTRIBUTION OF WATER—CUSTOM.—Adverse user of water for three times the statutory period of limitations in this territory ripens into vested right to the use of water. Where the evidence in the case shows a custom in the distribution of water, and that custom was certain, definite, uniform, and notorious, and had been acquiesced in for more than 16 years, it has acquired sufficient age to give it the force and sanction of law.

APPEAL from a Judgment of the County Court in and for the County of Pima. Reversed.

The facts are stated in the opinion.

Earll, Campbell & Stephens, for Appellant.

The plaintiffs plead the statute of limitations. The court

fails to find upon that issue. This error is fatal. *Knight* v. *Roche,* 56 Cal. 15; *Baggs* v. *Smith,* 53 Cal. 88; *Baggs* v. *Smith,* 53 Cal. 300; *Baggs* v. *Smith,* 53 Cal. 435; *Baggs* v. *Smith,* 53 Cal. 687.

The defendants have slept on their rights for a period extending from 16 to 50 years. In the meantime the plaintiffs have reclaimed the desert, built their homes, and lived in peace and plenty. There is still water for all, and certainly equity will protect these plaintiffs.

Hereford and Lovell, for Respondents.

WRIGHT, C. J.—Plaintiffs brought this suit in the county court of Pima county, in March, 1885, to restrain the defendants from preventing the waters of the Santa Cruz river from flowing through certain *acequias,* whereby said waters were conducted upon plaintiff's land. After averring that said lands had been owned and cultivated by plaintiffs, or those under whom they claim, for a period of time ranging from 16 to 50 years, the complaint then, among other things, alleges "that during all the times herein mentioned said lands have been irrigated from the waters of the Santa Cruz river, from one main *acequia,* and distributed by others, which were kept in common repair for the use of all, below one and one-half miles above said Silver lake, in proportion to the lands respectively cultivated. That for more than sixteen years these plaintiffs, their grantors and lessors, have contributed their respective proportion of labor and expense in maintaining all of said *acequias,* for irrigating said lands, equally with defendants, and all others below said point. That said lands are agricultural, capable of raising valuable crops; but without irrigation no crops can be raised, and those now growing will perish, and plaintiffs lose the labor pjerformed, seed sown, and expenses incurred attending the same. The defendants refuse to permit these plaintiffs to use any of the waters of the said Santa Cruz river to irrigate their respective lands. That said defendants, although requested to permit said water to flow through said *acequias* upon plaintiffs' lands, as plaintiffs were entitled to have them do, and as has been always heretofore permitted,

disregarding said right, since the said thirtieth day of March, 1885, have unlawfully prevented the use of said waters, and threaten to so continue to wholly deprive plaintiffs' of the enjoyment thereof.''

The answer denies and traverses the allegations of the complaint, except that it admits that lots 13 and 14 in section 10, and 23 and 24 in section 11, and the south 10 acres in section 11, had been occupied for 23 years; and the said answer further admits that the greater part of plaintiffs' lands as described in the complaint had been cultivated for 16 years. These admissions on the record are significant, and evoke a serious reflection. If the greater part of the plaintiffs' lands has been cultivated for the last 16 years, it was done with or without defendants' consent. If without their consent, have they not been guilty of laches, unreasonable delay, and inexcusable neglect in waiting 16 years without taking any steps to restrain the wrongful acts of plaintiffs? If the defendants were fairly put upon their guard; if they had actual knowledge that plaintiffs were diverting waters that belonged to defendants by virtue of prior appropriation; if they stood by for 16 years or more, and saw the plaintiffs build their houses, open out their lands, and put them in cultivation, expend their money in the improvement of these homes, pay their proportion of the expense, and bear their proportion of the labor in building and repairing the *acequais,* and otherwise do and perform such acts as indicated that plaintiffs believed they had equal rights with defendants to the waters of the Santa Cruz river, do not all these circumstances serve to imply that defendants waived or abandoned any exclusive prior right to said waters? At least, was there not such unreasonable delay as that they are now precluded from complaining? Will parties be permitted to stand by for 16 years or more, and see new fields put in cultivation, irrigated, forsooth, with water to which they have an exclusive prior right, see large sums expended in erecting new homes, and witness new and important interests intervene, and then be heard to complain? A *fortiori,* defendants will not be heard to complain if these things were done with their consent. Indeed, our opinion is, in this case, that acquiescence, non-action, on the part of

the defendants, for so long a time, *gave* consent. They could not consent "till right vested, and then *dissent*." So that it is really immaterial whether the irrigation was done with or without defendants' consent, if they stood passively by. See *Smith* v. *Hamilton,* 20 Mich. 433, 4 Am. Rep. 398; *Parke* v. *Kilham,* 8 Cal. 78, 68 Am. Dec. 310; *Joyce* v. *Williams,* 26 Mich. 332.

In the case of *Niven* v. *Belknap,* 2 Johns, 573, Judge Thompson held that *silence* worked an estoppel. In delivering the opinion of the court he says: "Though it does not appear positively from the evidence that Belknap took any active agency in this negotiation, yet his *presence* and *silence* are equally efficacious and binding upon him, if the complainant was thereby misled and deceived. There is an *implied,* as well express, assent; as where a man who has a title an knows it, and either encourages or does not forbid the purchase, he and all claiming under him, shall be bound by such purchase." It is very justly and forcibly observed by a writer on this subject (Rob. Frauds, 130) that there is a negative fraud in imposing a false apprehension on another by silence, where silence is treacherously expressive. *In equity, therefore, where a man has been silent when in conscience he ought to have spoken, he shall be debarred from speaking when conscience requires him to be silent."*. And in the case of *Gregg* v. *Von Phul,* 1 Wall. 274, the learned judge used this language: "No one is permitted to keep silent when he should speak, and thereby mislead another to his injury."

In the case at bar, the defendants allowed the plaintiffs, or those under whom they claim, to open out their fields, and irrigate them with water of the Santa Cruz river, as though they had a vested right therein; to vote for and participate in the election of water overseers or commissioners; to pay their proportion of the assessment for water development, etc.; to pay their part of the expenses, and do their part of the labor, in cleaning and repairing the *acequias;* to expend large sums of money in payment for their lands, putting them in cultivation, and building their homes, —and all this, too, for a period of 16 *years* or more. Can the defendants now exclude the plaintiffs' from a participation

in the use of these waters? We are of the opinion that they cannot. See *Dickerson* v. *Colgrove,* 100 U. S. 578; *Kirk* v. *Hamilton,* 102 U. S. 68, and authorities there cited. Judge Harlan, in this case, quotes from *King* v. *Inhabitants of Butterton,* 6 Term R. 554, in which Justice Lawrence said: "I remember a case some years ago in which Lord Mansfield would not suffer a man to recover in ejectment where he had stood by and seen the defendant build on his land." This doctrine of equitable estoppel *in pais* will apply to cases even in courts of law.

It might be observed that, in this case, it is true there were occasionally disputes about who had the prior right to the use of the water. Indeed, from the defendants' testimony, especially that of Mr. Oury, these individual disputes had occurred prior to 1862, a period anterior to the time, as alleged in defendants' answer, when the plaintiffs first cultivated their lands; so that some of these disputes must have occurred between occupants of the "Old Fields" alone, while some of them may have occurred between occupants of the "New Fields" alone. But the testimony all shows, from first to last, that the plaintiffs always claimed an equal right to the *use* of said waters. The testimony, we think, also shows that plaintiffs also equally *enjoyed* the *use* of said waters, and there seems to have been a pretty general acquiescence in the plaintiff's said use until the year 1885, when by some means, which are not apparent from the evidence, Carrillo, Hughes, and Davis became the acting water commissioners, by whose authority perhaps, whether legitimate or, not, Rentaria, the acting water judge or overseer, prevented the flow of said waters through said *acequias* upon plaintiffs' land; and this suit is therefore the first distinct contest between the cultivators of the "Old" and "New Fields," involving their respective rights to the use of the waters of the Santa Cruz river.

Again, the admissions in defendants' answer raise another important question. All the evidence shows—in fact, it would go without saying—that the lands in the valley of the Santa Cruz river, both the "Old and New Fields," are absolutely worthless for agricultural purposes without the waters from said river. Now, if the greater portion of

plaintiffs' land has been in cultivation for 16 years or
more, it must inevitably have been irrigated with waters
from the Santa Cruz river; and taking the averment in
defendants' answer as true, that plaintiffs only had the
use of the *surplus* water, is not the conclusion inevitable that
there is, ordinarily, enough water in said river to irrigate,
with the necessary, reasonable, and economical use of the
water, all the lands in said valley, both old and new? If
the plaintiffs got the benefit of the *surplus* water only, there
must have been quite a quantity of it,—enough to fructify
their crops; for certainly they would not have remained there
for 16 years with their families, and starved. It seems to
us the admissions in the defendants' answer are inconsis-
tent with the theory that plaintiffs had only the use of the
*surplus* water. The evidence of plaintiffs shows that they
used the water of the Santa Cruz river just the same as
the defendants; while defendants' evidence, although
claiming rights prior to plaintiffs' to the use of the water,
and that plaintiffs had only the right to use the *surplus*
water, yet it is not seriously denied that plaintiffs actually
*did use* the said waters, as claimed in the complaint.

Now, we are well aware of the well-settled rule that where
the evidence is sufficient to support the finding, or where
the evidence is conflicting, although it may greatly prepon-
derate against the said finding, the appellate court will not,
at law, interfere; where, however, in equity, the evidence
is clearly insufficient, or where there is no evidence at all,
it is otherwise. Besides, the object of a motion for a new
trial is to enable the appellate court to look into the evi-
dence to see if it be sufficient ·to support the finding; and
in looking into the evidence here we have not been able to
escape the conclusion that the court below erred in its find-
ing that plaintiffs· sued, without objection, only *surplus*
water, after the "Old Fields" had been irrigated. True,
there was abundance of evidence that they only had had the
right to *use* such *surplus* water; but if they used water
other than *surplus,* even without right, for 16 years, with-
out absolute hinderance by the defendants, can the defend-
ants now complain? We think not. "If the owner of an
·estate stand by and see another expend money on an ad-

joining estate, the latter relying upon an existing right of
easement in the other estate, without which such expendi-
ture would be useless, *and do not interfere to prevent the
work,* he will not be permitted to interrupt the enjoyment
of such easement." See Bigelow, Estop. 512. This is al-
most exactly the case at bar; defendants certainly stood
by and saw plaintiffs opening out their fields; they must
have known, too, that plaintiffs would not be guilty of the
extreme folly of going to such trouble and expense with-
out expecting the use of the waters of the Santa Cruz river;
this being the sole and solitary resource.

In a word, our view of this case brings it clearly within
the rule of what is known as "estoppel by contract." De-
fendants may have had the prior right, but they lost it by
their own conduct. They could have spoken, and were silent;
they could have acted, and were passive. Counsel for de-
fendants offered in evidence a map made by order of one
Major Ferguson, in 1862, when martial law had been de-
clared in Tucson, to show, as counsel stated, the boundary
lines, *i. e.*, the lines beyond which the settlers of the "New
Fields," in the use of water, could not go, as *per* determin-
ation of commissioners appointed, not by the people, but by
the said Ferguson, under those martial-law proceedings.
The plaintiffs, by counsel, objected to the admission of said
map. The court, however, overruled the objection, and ad-
mitted the same. We think this was error. What jurisdic-
tion or authority a military officer had to exercise judicial
functions, (outside of military affairs,) or to authorize others
to do so, and to adjudicate upon and settle the rights of
citizens to the use of this water, and to order an official
map made, circumscribing the limits of these water priv-
ileges, is more than we have been able to ascertain. Major
Ferguson had been appointed military governor of Tucson
by Gen. Carleton. The latter had no authority to confer,
and he did not confer, judicial authority upon his subordin-
ate to sit in judgment upon and determine the *civil* rights
of a citizen, or to authorize others, not otherwise capaci-
tated, so to do. There was no military necessity that these
martial-law proceedings should be had, and this map be
made, divesting and vesting the civil rights of the citizen.

Martial law may enforce order, but has no jurisdiction over property rights. We do not find such authority in the Constitution, nor do we find it in the laws. Congress has never gone so far as to authorize the confiscation, by the military, of real estate in this country. Sorry the day, when the title to real property in this republic shall hang upon the whim of a military officer. If these proceedings, under this military governor and the reign of martial law, amounted to anything, they were a quasi confiscation of the property rights which one class of citizens may have had in said waters, and vested them in another class.

These proceedings, according to the answer, were all had prior to the settlement of the "New Fields." Defendants are bound by that answer. Therefore we are unable to see any relevancy this map has in this case, or on what ground it could be competent to establish the fact for which it was offered.

Those proceedings, evidently had no binding force, beyond the temporary ascendency of the military. Surely they could not effect the permanent civil rights of the citizen. Where the mailed hand was lifted, the elastic rights sprang back to their normal condition.

The absorption by the military of civil rights is a dangerous encroachment and has never been justified in this country except upon the tyrants plea of military necessity.

Again, we think the defendants are barred by the statute of limitations of this territory, and by prescription, and that the court below erred in not so finding. True, the complaint may have been obnoxious to criticism in this respect: the statute could have been pleaded more specifically; but the complaint avers "that each of which said tracts of land has been owned, possessed, occupied, and cultivated continually by plaintiffs or their predecessors in title for a period of not less *than sixteen years;*" and "that during all the times herein mentioned the said tracts of land have been irrigated by the waters of the Santa Cruz river, taken from said river by one main *acequia,* and distributed by several other *acequias,* which were constructed and kept in repair in common, and for the common use of all the people." No objection was raised in the trial below

to this pleading. The answer of defendants specially denied each of these averments, except as to the time said lands had been cultivated; and the evidence largely concerned the length of time of plaintiffs' user; so that this issue was undoubtedly joined, and was the important question in this litigation. Criticisms will not be made, or objections raised, to a pleading for the first time in an appellate court. See *Crans* v. *Hunter*, 28 N. Y. 395; *White* v. *Railroad Co.*, 50 Cal. 417; *Hutchings* v. *Castle*, 48 Cal. 155; *King* v. *Davis*, 34 Cal. 100. With reference to the rights acquired in the use of water, estoppel *in pais*, and title by limitation and prescription, are very similar; and reasoning upon one will inevitably enfringe upon that of the others, especially in a case like this. Indeed, title by limitation, and title by prescription, to real estate, are practically synonymous.

This issue was raised, then, and the court below failed to make a finding either of law or fact upon it; which we think was manifest error. But the court did make a finding, both of law and fact, upon an issue that was certainly not raised by either complaint or answer; viz.: "That the occupants of said gardens, [Chinese gardens,] which have had the continual use and enjoyment of said water for the irrigation thereof for more than five years continuously next before the commencement of this action, and claiming said right adversely to all others, are entitled to the continued use of so much water, upon Saturdays and Sundays, as may be necessary for the proper irrigation thereof." The court then proceeds to find that much of this Chinese garden land has been so occupied for from 6 to 15 years; and then proceeds to decide, in its opinion, that the defendants have acquired the right to the additional water necessary to irrigate these Chinese gardens, comprising, probably, 150 acres, by adverse user and prescription. There was no such issue in the case as this; the defendants did not raise it in their answer; and even the evidence that crept into the case on this point certainly was insufficient to justify the finding and decision. Neither side had invoked judicial acting on this question. We are of opinion, therefore, that this much of the finding and decision, both of law and fact, of

the learned judge below was error; it was *coram non judice.*
These Chinese gardens, and the speculative inclinations of
the owners, may have been the source of much trouble be-
tween the parties herein; and yet neither the pleadings nor
evidence disclose it; the information is obtainable only in
said finding and opinion.

The evidence shows that plaintiffs have always claimed an
equal right to the use of the waters of the Santa Cruz river;
and while, as we have already observed, the evidence also
shows that defendants had the prior right, yet the plain-
tiffs, and those under whom they claimed, not only claimed
an equal right, but they had *the use* of said waters without
prevention by defendants until just before the commence-
ment of this suit.   Most of the defendants' testimony, aside
from a mass of testimony as to damages, was as to the
*prior right,* and not as to the *prior use,* of said water.   Gal-
iardo, an old gentleman, 72 years old, testified that at one
time he had owned most of the "Old Fields" above.   At
that time water was common, and he told the settlers of
the "New Fields" that he would not stop them; that the
government protected agriculture; that they were children
of the town and his neighbors.   Juan Elias, another old
citizen, testified that "the people below [the cultivators of
the new fields] often won the fight, and elected the water
overseers.   The had equal shares of water."   And Squire
Charles H. Myers, the justice of the peace before whom
these individual disputes about water came, says, in his
testimony for the defendants, that he had before him prob-
ably a dozen of these disputes.   Says he: "Whenever there
was a quarrel about the water, there is a custom to appoint
a commission, and they would go out and see whose grain
needed the water the most.   After they had seen the fields,
they would come in and report, and say such and such a
man's field, if it does not get it, [water,] will be lost; and
that the field above could do without water till that got
through.   And, although they had no *right* to it below, un-
der that system it was distributed to them; and it was
understood among the Mexicans, and they always knew it
was so, as long as they farmed here.   And if the upper
fields were suffering, and the lower fields were suffering,

the lower fields would have to suffer, because the new fields were entitled to the water last." It is to be observed that there is not one word in this important witness' testimony about *surplus* water.

Mr. Rentaria, one of the principal defendants, in his testimony says: "They [the water committee, Hughes, Carrillo, and Davis; just where their authority comes from does not clearly appear,] told me not to let the water pass down there [on the new fields]*if they did not pay for it.* I told them that Mr. Maish [up at the mill] had all the water stopped. They [the committee] told me: 'If you can't take care of the fields down there, take care of the fields up here.'" The witness, who had been water judge for 12 years, was asked this question: "Before that time, [March, 1885,]*have you given the people below the lane water the same as you have those above* the lane? *Answer. Other years I had;* but Mr. Dalton and others were the first to buy tickets, and Mr. Leon and Pacheco had bought tickets, and I gave them the water. *Q.* What time did Maish shut off the water? *A.* About the fifteenth of March; he let it overflow. He got some men and raised the embankment higher around the pond. After he fixed his dam, he kept the water back for twelve days, then there was a little amount of water." He afterwards corrects the time, and makes it from the first to the fifteenth of April.

Another fact of some significance, tending to corroborate the testimony of the plaintiffs, is that, as soon as the "New Fields" began to be settled, the "old common fence" was allowed to disappear. F. S. Leon, who, in 1862, under the martial-law proceedings, (which defendants had invoked for some reason in their case,) was appointed, not by the people, but by said Ferguson, the military governor of Tucson, one of the water commissioners, assumed to settle the rights of the disputants. When this witness was asked why that "old common fence" was allowed to disappear after the "New Fields" began to be settled, his answer was, "I don't know." The fact remains, however, that it did disappear about the time the "New Fields" began to be settled up and cultivated.

The evidence of these witnesses, (the most important and

impartial for the defendants, perhaps,) together with plaintiffs' witnesses, and the other facts and circumstances of the case, undoubtedly show that, until a lated date, there had been a general *sufferance* of an equal and equitable distribution of said waters; regard being had to those fields needing the water the most.

Beyond question, the settlers of the "Old Fields," most of them, had a prior right to these waters; but for 16 years or more they did not enforce it. Can they do it now? Are they not barred? Plaintiffs' adverse user of these waters for a time three times greater than the period of statutory limitations in this territory, has, we think, ripened into vested right to the equal use of the waters of the Santa Cruz river, with the cultivators of the "Old Fields," proportional to the number of acres in cultivation, and regard being had to the fields needing the water the most. See *Water Co.* v. *Richardson,* 72 Cal. 598, 14 Pac. 379.

We entertain the belief, from the evidence in this case, that there was a custom among these people in the distribution of this water; that that custom was certain, definite, uniform, and notorious; that it had in it the elements of equity and good conscience, of neighborly kindness and good will, and that under it cultivators of the "Old Fields," while claiming the prior right to the use of said water, and the cultivators of the "New Fields," while claiming an equal right to the use thereof, had settled their wrangles and disputes, and had lived together as neighbors and friends for more than 16 years, and had ultimately acquiesced in an equitable and equal distribution of said water, giving it first to those fields that needed it the most; and this custom, we think, has acquired sufficient age to give it the force and sanction of law.

There is something to be deplored in the spirit of that neighbor, who would take the crust from his neighbor's lips. These people should live together as neighbors, sharing each others misfortunes and rejoicing in each others blessings, in our conscience from the testimony we believe there is sufficient water in the Santa Cruz river, if only a necessary, economical and reasonable use thereof is had, to irrigate all these lands. There can be no doubt of the para-

mount importance of this water question.   In a country where water is so scarce and so precious as it is in this Territory, it is of the utmost importance that its distribution and use should be as extensive as vested rights and material interests will admit.   It is the policy of the law to encourage the building of new homes, the opening out of new farms.   Thep rosperity of the Territory depends largely upon this policy; while motives of patriotism and good citizenship prompt to its hearty support.

Judgment reversed, and cause remanded to First judicial district court in and for Pima county, with directions to enter judgment for plaintiffs, making perpetual the injunction.

Wright, C. J., Barnes and Porter, JJ., concur.