PITTSBURGH & LAKE ANGELINE IRON CO. *v.* LAKE SUPERIOR IRON CO.

1. INLAND LAKES—RIPARIAN RIGHTS.
    No fixed rule ever has been or ever can be laid down for the division of the territory covered by inland lakes. Each case must depend upon its own peculiar circumstances and facts, and as reasonable a division arrived at as possible.

2. CONTRACTS—MISTAKE OF LAW—OVERRULED DECISIONS.
    Contracts made on the faith of the law as enunciated in a decision of a court of last resort, in the absence of fraud, misrepresentation, or want of knowledge of all the facts, will not be set aside because of a subsequent decision by the same court overruling the former one, since a mistake of law is no ground for relief.

3. BOUNDARIES—ADJUSTMENT—ADVERSE POSSESSION.
    Where disputed boundary lines have been established by express agreement, or under such circumstances that an agreement will be implied, and the parties have for any considerable time recognized them, they will be upheld, though title by adverse possession could not be maintained.

4. SAME—DISPUTE—EVIDENCE.
    Evidence that one of two companies owning land bordering upon a lake requested the other to deed to it such of the land under the waters of the lake as would be included within its subdivision of the section if its lines were projected through the lake, and that the request was refused on the ground that the boundary between the properties should be determined with reference to the rules of riparian ownership, shows that the boundary was in dispute.

5. SAME—ESTOPPEL—STATUTE OF FRAUDS.
    The statute of frauds, which operates to forbid the acquiring of

title to land by estoppel, has no application to voluntary adjustments of disputed boundaries, to which, therefore, the doctrine of estoppel may be applied.

6. SAME — MINING  CORPORATIONS — ALIENATION OF PROPERTY — AUTHORIZATION BY STOCKHOLDERS.

A voluntary adjustment of boundary lines between mining corporations owning property bordering upon a lake, whereby they surrender, respectively, all claim to land on the north and on the south side of a section line projected through the lake, each thereby acquiring territory claimed by the other, the actual ownership of which could be determined only in equity, is not an alienation, division, or sale of the corporate real estate, such as will enable one of the companies to avoid the adjustment under 1 How. Stat. § 4052, on the ground that it was not authorized by three-fifths of the stock.

7. EQUITY — ANNULMENT OF  CONTRACT — SUBSTITUTION OF DIF- FERENT AGREEMENT.

While a court of equity may annul a contract for fraud or mistake, it cannot substitute therefor a different agreement, fixing the liability of the parties upon a basis not contemplated nor assented to by them.

8. SAME—LACHES.

A delay by a party to seek relief from a contract, of two and a half years after the overruling of a decision in reliance on which it was made, and of nine months after being informed of such overruling by its attorney, during which time the conditions have so changed that it is impossible to restore the *status quo,* is such laches as will defeat its right to relief.

Appeal from Marquette; Stone, J.    Submitted April 23, 1898.    Decided September 20, 1898.

Bill by the Pittsburgh & Lake Angeline Iron Company against the Lake Superior Iron Company and the Cleveland Iron-Mining Company for an equitable division of the territory formerly covered by the waters of Lake Angeline, and for other relief.    From a decree dismissing the bill, complainant appeals.    Affirmed.

Lake Angeline was situated on sections 10, 11, and 15, township 47 N., range 27 W., and was within the corporate limits of the city of Ishpeming, in Marquette county. It contained 148.61 acres within the government meander lines. It was a mile in length east and west, and 1,690 feet in width on the center line of section 10, which was its widest point. The lake was meandered, and the courses and distances of the meander lines of the original survey are shown by the field notes of the United States government surveyors. The official plat was introduced in evidence. A copy of a part of said plat, sufficient to show the location of this lake upon the sections mentioned, is herewith given. The figures on the map show the number of acres in each parcel according to the government survey.

The three parties to this litigation own all the lands surrounding this lake,—the complainant owning that part of section 15 bordering upon the lake; the defendant Cleveland Iron-Mining Company owning that part of sections 10 and 11 bordering on the lake east of the center line of section 10; and the defendant Lake Superior Iron Company owning that part west of said center line. These

three mining corporations have owned this land about 30 years, and have been engaged in mining upon their respective properties for more than 20 years. For the sake of brevity, these companies will be designated by their initial letters.

The patent under which the C. I. M. Co. holds its title contains the following description: "The east half' of section ten (10) and the west half of section eleven (11), in township forty-seven (47) N., of range twenty-seven (27) W., containing 555 acres and 15-100 of an acre, according to the official plat." The patents under which complainant holds title describe the land as lots 2, 3, 4, and 5 of section 15. The patents under which the L. S. I. Co. derive title described the lands as lots 4, 5, and 6 of section 10.

No ore was known to exist in the bed of the lake until the winter of 1886 and 1887, when the agent of the C. I. M. Co. caused three diamond drill borings to be made through the ice into the rock upon the north side of the lake, resulting in the discovery of iron ore. These borings were not upon territory now claimed by the complainant. Knowledge of this was conveyed to the complainant's agent, but doubts were expressed whether the ore extended into complainant's property. In 1890 complainant sunk a shaft a short distance south of the south line of section 10, adjacent to the southeast arm of the lake, and in 1891 discovered good ore. Drifts were run in various directions, including one to the northwest, in order to ascertain the extent of the ore. These explorations resulted in the probability that the ore would continue northwest, into section 10. This discovery was communicated to the C. I. M. Co. In the latter part of 1892, complainant permitted the C. I. M. Co. to enter its shaft, and drill holes from the south side into the territory north of the section line, and ore of good quality was found. Five holes were thus drilled. In order to keep out the water from its mine at the southeast arm of the lake, complainant contemplated building a cofferdam across this arm,

and would probably have done this but for the agreement
hereinafter referred to. Negotiations were soon thereafter
entered into between the parties for pumping the water
out of the lake. Mr. B. C. Howell had made a proposi-
tion to drain the lake by pumping for $33,000. These
negotiations were evidently conducted for some time.
The first writing that appears upon the subject was a let-
ter from complainant to the C. I. M. Co., dated at Ishpem-
ing, March 2d, and is as follows:

"*Gentlemen:* Providing you close by March 15, 1892,
a contract with B. C. Howell to drain Lake Angeline for
$33,000, in full, and only on completion of the work, we
will pay you one-fifth (1-5) of such cost, less one-fifth (1-5)
the then estimated value of such plant as becomes yours
at that time. We also, by reason of not entering into a
joint contract to keep the lake bed empty, agree that we
will construct a flume to take away all drainage from our
side of the section line, and maintain it until the ore on
such land, situated under the lake bed, is exhausted.
After that you may take the flume without charge, and
care for it as you see proper.
"Yours truly,
"PITTSBURGH & LAKE ANGELINE IRON CO.,
"By Thos. Walters, Sup't.""

This proposition was indorsed as follows:

"Conditions accepted.
"CLEVELAND IRON-MINING COMPANY,
"By F. P. Mills, Agt.""

Upon a petition, signed by all the parties, to the com-
mon council of the city of Ishpeming, the following ordi-
nance was adopted on March 16, 1892:

"An ordinance granting permission to the Cleveland
Iron-Mining Company, the Lake Superior Iron Com-
pany, and the Pittsburgh & Lake Angeline Iron Com-
pany to pump out and permanently drain Lake Ange-
line.
"*Whereas*, the Cleveland Iron-Mining Company, the
Lake Superior Iron Company, and the Pittsburgh & Lake
Angeline Iron Company, by *mesne* conveyances from the
original patentees of the United States, severally own all

the land surrounding Lake Angeline, which said lake is situated within the corporate limits of the city of Ishpeming, and therefore, exclusively, severally own the bed of said lake, as follows, to wit: The said the Cleveland Iron-Mining Company, all that portion of the bed of said lake lying east of the center line of section ten (10) as projected through said lake, and north of the south line of section ten (10) and section eleven (11), township forty-seven (47) north, of range twenty-seven (27) west, as so projected; the Lake Superior Iron Company, all that portion of the bed of said lake lying west of the center line of said section ten (10) and north of the south line of said section ten (10) as projected through said lake; the Pittsburgh & Lake Angeline Iron Company, all that portion of the bed of said lake lying south of the south line of said section ten (10) as projected through said lake, and the surface right of lot six (6) of said section ten (10), as acquired by them from the Lake Superior Iron Company.

"*And whereas*, the said three companies desire to pump the water out of said lake, and to permanently drain the same, in order to severally conduct mining operations on the respective portions of said lake bed belonging to each, and desire the formal permission and authority of the common council of the city of Ishpeming so to do, said lake lying and being within the corporate limits of said city:

"*Therefore*, be it ordained, by the common council of the city of Ishpeming:

" Section 1. That consent, permission, and authority are hereby given and granted and duly vested in the said the Cleveland Iron-Mining Company, the said the Lake Superior Iron Company, the said the Pittsburgh & Lake Angeline Iron Company, and their respective successors and assigns, to pump out and drain away the water of the said Lake Angeline, and, thereafter, to permanently drain the same, and to maintain and operate the necessary machinery and pumping apparatus and appliances so to do: *Provided*, that the water pumped out of said lake and permanently drained therefrom shall be carried away through the present outlet of said lake into Carp river.

" Sec. 2. This ordinance shall take effect from and after the passage thereof."

The petition set forth the ordinance in full.

On the following day the parties executed an agreement, the material parts of which are as follows:

"This agreement, made this 17th day of March, A. D. 1892, by and between the Cleveland Iron-Mining Company, first party, the Lake Superior Iron Company, second party, and the Pittsburgh & Lake Angeline Iron Company, third party, all corporations organized under the laws of the State of Michigan, *Witnesseth:*

"*First.* That *whereas,* the three parties to this agreement severally own all the land surrounding Lake Angeline, in the county of Marquette, State of Michigan, and, iron ore having been discovered under the bed of said lake, it has become necessary to pump out the water of said lake, and permanently thereafter drain the bed thereof, in order that each of the parties hereto may economically mine such ore as lies under such portions of said bed as each of said parties is respectively entitled to.

"*Second.* And *whereas,* one B. C. Howell, prior to the date of this contract, had a large pump suitable for such work, and proposed to said first party to contract to pump out said lake, and to sell said pump and necessary appliances, all for the sum of thirty-three thousand dollars ($33,000), provided he could begin operations immediately, while firm ice remained in said lake, so as to furnish the necessary support for placing the proper timber work in position; and *whereas,* said first party, after communicating with said second and third parties and getting their approval, has entered into a contract with the said Howell to pump out the water of said lake, and to purchase said pumping apparatus and appliances, for said sum, thus making a large saving in the cost thereof; and *whereas,* the cost of the continuous drainage of the bed of said lake, after the water thereof is pumped out, is now impossible of ascertainment, and the parties hereto are desirous of fixing the proper proportion of expense, both of the purchase of said pumping apparatus and of the pumping out of said lake, and of the cost of the continuous or permanent drainage of the bed thereafter, to be borne by each, the same being for the mutual benefit of all:

"Now, *therefore,* the parties hereto, in consideration of the premises, and of mutual considerations received by each from each, the receipt of which is hereby respectively acknowledged, hereby agree as follows:

"*Said first party agrees: First.* To bear and pay

eight-fifteenths (8-15) of the entire cost of the purchase of said pump and apparatus, and of the pumping out of said lake, under the arrangement with the said Howell, to wit, the sum of seventeen thousand six hundred dollars ($17,600), and eight-fifteenths (8-15) of any additional cost which may be necessarily incurred in the premises, and will also bear and pay one-fifth (1-5) of the value of said pump and appliances after the lake is pumped out, which one-fifth (1-5) thereof is to be deducted, as hereinafter provided, from the amount to be paid by said third party. *Second.* After said lake is once pumped out by said Howell, to maintain and operate the said pumping apparatus and plant for the continuous and permanent drainage of the bed of said lake, advancing all necessary expenses for such maintenance, operation, and repairs, and, at the end of each calendar year, to pay and bear such a proportion of the cost thereof during the year preceding as the total number of tons of ore mined and produced by said first party from that portion of the said lake bed belonging to it during said year bears to the total number of tons of iron produced and mined during such year by said first and second parties jointly from the bed of said lake, and, further, to bear and pay two-thirds ($\frac{2}{3}$) of the cost of any additional or other apparatus which may be needed for the permanent drainage of said lake.

"*Said second party agrees: First.* To bear and pay four-fifteenths (4-15) of the entire cost of the purchase of said pump and apparatus, and of the pumping out of said lake, under the arrangement with the said Howell, to wit, the sum of eight thousand eight hundred dollars ($8,800), and four-fifteenths (4-15) of any additional cost which may be necessarily incurred in the premises. *Second.* To bear and pay to said first party, on settlements to be made at the end of each calendar year, such a proportion of the entire cost of maintaining, operating, and repairing the plant for the permanent drainage of said lake bed as the total number of tons of iron ore produced and mined by said second party from that portion of the lake bed owned by it during such year bears to the total number of tons of iron ore produced and mined by said first party and said second party from the entire lake bed during such year, and also to bear and pay one-third ($\frac{1}{3}$) of the cost of any additional or other apparatus which may be needed for the permanent drainage of said lake.

"*Said third party agrees: First.* To bear and pay three-fifteenths (3-15) of the entire cost of the account to

be paid to the said Howell under the arrangement of said first party with him, to wit, three-fifteenths (3-15) of the said thirty-three thousand dollars ($33,000), namely, the sum of six thousand six hundred dollars ($6,600), and three-fifteenths (3-15) of any additional cost which may be necessarily incurred in the premises, less one-fifth (1-5) of the value of said pump and appliances purchased from the said Howell under the arrangement with him, the value of which is to be estimated as soon as the first drainage of said lake is completed. *Second.* To erect and maintain a proper and sufficient flume, so constructed above the present water level of Lake Angeline as to divert and carry away all the surface water or other surface drainage which would otherwise come into the present bed of said lake from all the land lying above the present water level of said lake, and south of the south line of section ten (10) as projected through said lake, and also to run into said flume any and all water which the said third party may pump from its mine or mines; which said flume said third party agrees to maintain and keep in repair and in successful operation, diverting such drainage from the bed of said lake, until the iron ore to which said third party is entitled, lying on, in, or under the portion of the bed of said lake lying south of the said south line of said section, is mined and exhausted, and then to turn over said flume in good repair to the said first and second parties hereto, without charge, and to allow them thereafter to operate and maintain the same for the purpose of continuing said drainage, giving the employés of said first and second parties free access in and to said flume for the purpose of maintaining, repairing, and operating the same, allowing them to make such alterations in said flume, and in the direction of the same, as may be necessary to successfully accomplish such drainage."

This agreement was signed, sealed with the corporate seal, and acknowledged with all the formalities of a deed. The certificates of acknowledgment stated that the president and secretary of each company acknowledged—

"That they duly executed the foregoing instrument for and on behalf of said corporation, duly authorized thereto, and that the same is the free act and deed of said corporation, and the free act and deed of themselves as such officers."

The contract was carried out, and the drainage completed December 24, 1892. The total cost of draining and of keeping the water pumped out until January 1, 1897, was $76,488.38. Of this, the C. I. M. Co. paid $44,149.68; the L. S. I. Co., $17,147.18; and the complainant, $7,601.38; the balance of $7,590.14 being left for adjustment between the defendants. The water under the southeast arm of the lake was comparatively shallow. A vast body of mud was found in the bottom of the lake, and the two defendants incurred an expense, in attempting to remove it, of $20,227.53. After the execution of this contract, each party worked upon its own property as defined thereby. The complainant mined out all the valuable ore under the southeast arm, and afterwards filled its opening with the waste rock. The L. S. I. Co. made explorations at considerable expense, and the C. I. M. Co. made the five drill holes above referred to from the complainant's mine, and ran a drift through the rock underneath the lake nearly to the south line of section 10, and, after reaching ore, ran drifts and cross-cuts, with a view to determining the value of the ore, and ascertaining if there was sufficient to open and equip a mine. All this involved large expense.

The section line was regarded as the line dividing these properties. Nails were driven in the timbers underground to indicate the line. In 1894 complainant made an innocent trespass north of the line, for which an amicable settlement was made. In 1896 the C. I. M. Co. trespassed upon complainant's property south of the line, and amicably settled for it. Maps were frequently exchanged with each other. Complainant asked and obtained permission from the C. I. M. Co. for the construction of a railroad track north of the section line, which was constructed and has ever since been in operation by complainant. On March 21, 1894, the C. I. M. Co. executed a lease to complainant, granting it the right to use land north of the section line for stock-pit grounds, and the erection of temporary structures for mining purposes. Other acts

also were done by the respective parties in recognition of the fact that the south line of section 10 was the boundary line, as stated in the above agreement. This state of affairs continued until in November, 1896, when complainant served a notice upon the defendants that it claimed title to certain lands north of the section line.

One other fact should here be noticed. Complainant commenced mining on lots 4 and 5 in 1863. The hill was very near the shore of the lake, and complainant dumped its waste rock into the lake, and filled in several acres north of the section line. Upon this made land north of the line it erected some buildings, the most of which it removed to the south of the line in 1887.

Complainant filed its bill of complaint November 23, 1896. Issue was duly joined, proofs taken, and decree entered dismissing the bill.

*Clark & Pearl* (*Alfred Russell*, of counsel), for complainant.

*Ball & Ball* (*Benton Hanchett*, of counsel), for defendant Lake Superior Iron Company.

*George Hayden* (*Hoyt, Dustin & Kelley*, of counsel), for defendant Cleveland Iron-Mining Company.

GRANT, C. J. (*after stating the facts*). The theory of the complainant's bill is that the territory formerly covered by the waters of this lake should be divided among the shore owners in proportion to the amount of shore frontage owned by each; that such ownership extends to the center of the lake, to be equitably established by the court; and that such territory should be partitioned by convergent lines drawn from the outside limits of each frontage to a convergent point called the "equitable center." To the bill is attached a map purporting to contain such equitable division.

The equitable center is placed a short distance east of the center line of the section, and about 12.84 chains north

of the south line. To this center lines are run from the several points where the meander line crossed the south line of the section. A piece of land in the shape of an obtuse-angled triangle is thus carved out of the bed of the lake upon the southwest quarter of section 10, and contains 14.92 acres. A similar piece is carved out of the southeast quarter of section 10, and contains 10.84 acres. These pieces are claimed by the complainant, while the triangular piece between them, containing 4.05 acres, is apportioned to the L. S. I. Co. by virtue of its ownership of lot 6. The southeast arm of the lake, south of the section line, contained 12.50 acres. The part between lots 4 and 5 and the south line of the section contained 5.57 acres. This apportionment, if adopted, would give the complainant the entire southeast arm of the lake, and from two-thirds to three-quarters of the west arm.

The only reference made in the bill to the agreement above given, or to the action of the parties thereunder, is as follows:

"And your orator further alleges that within the last four or five years, by mutual consent, your orator and the said defendants shared in the expense of pumping out and draining the said inland lake, your orator paying three-fifteenths of said expense, the defendant the Lake Superior Iron Company four-fifteenths, and the defendant the Cleveland Iron-Mining Company the balance, so that now said lake has been drained of water, except what is easily disposed of by moderate pumping."

The claim of the C. I. M. Co. is thus stated:

"1. The patent under which the defendant the Cleveland Iron-Mining Company claims title gave it title to the whole east half of section 10 to the south line thereof, and complainant is barred from objecting to this claim, because it has treated a body of water covering a portion of that territory as of no value, and joined in the draining of the water, as if the land was merely swampy ground, valueable only when reclaimed and made dry land.

"2. Because it has title by adverse possession for more than 15 years.

"3. Because the south section line of section 10 was

fixed as a boundary by agreement between the parties; that agreement being recognized and evidenced by the pumping contract and its written adjuncts, and was followed by continuous acts of recognition thereof, and expenditures based thereon, by both parties.

"4. Because the pumping contract is an estoppel by deed against the complainant from now asserting title.

"5. Because the complainant is estopped by matter *in pais* from asserting title to the land.

"6. Because the complainant is estopped by its laches.

"7. Because, as a tenant of a portion of the premises in dispute, complainant is estopped to deny defendant's title."

The claim of the L. S. I. Co. is thus stated:

"1. That there has been a practical division of the lake bed between the parties; that contracts, explorations, and mining operations have been carried on on the strength of such division for many years, in which large sums of money have been expended, without any certainty at the time of such expenditures that returns would be realized by the defendants therefrom; and that, by such division and long course of construction between the parties, the complainant is estopped to claim any portion of the lake bed lying north of the section line.

"2. That the pumping contract, executed by the several parties under their corporate seals, and expressly providing that it shall be binding upon the successors and assigns of the several parties, making it a contract running with the land, amounts to a division of the lake bed by deed duly executed by the several parties.

"3. That the pumping contract is so entirely based upon the division of the lake bed above mentioned, and said division forms so essential a part of the contract, that, if such division be set aside or disregarded, the contract itself must fall; that in such case not only is the agreement to continue the drainage of the lake at an end, but either party has a right to demand that the drainage of the lake must stop, and the water allowed to rise to its original level,—a result which, after all that has been done under the pumping contract, and in reliance upon it, would work great injustice to the defendants.

"4. That if the original division of the lake be disregarded, and a new division must be made, such division must be made by the middle line or thread of the lake, in accordance with the common-law rule for division of the bed of fresh-water streams."

The situation is anomalous, and the books present no similar case. In March, 1892, the parties entered into an agreement to extinguish the lake by pumping out the water, leaving the territory dry ground. They agreed upon an apportionment of expense substantially according to the territory within the lines of the government survey. The lake no longer exists. Nearly five years after, this suit is planted upon the theory that the lake exists, and that the court must make an equitable division from a common equitable center. All the parties, however, seem to have discussed the question as of a lake actually in existence.

The difficulty in apportioning the territory according to the theory of complainant is apparent from its irregular form. It seems conceded by the learned counsel for the complainant that the division according to the diagram made a part of its bill cannot be sustained, because they concede that it may be more equitable to divide the two arms of the lake according to the river rule, viz., the *medium filum aquæ.* It must also be conceded that the C. I. M. Co., under this rule, would be entitled to some of the territory lying under the southeast arm of the lake south of the section line. In this territory the complainant, in 1891, discovered valuable ore, which it has mined through its shafts, levels, and drifts. Complainant has no means of ascertaining how much ore was taken from this territory, part of which, under its theory, belongs to the C. I. M. Co. Part of the territory has caved in, and the rest is filled with waste rock.

The distance from the south section corner, between sections 10 and 11, to the meander line, is 125 feet. The meander line then runs from the south section line, in a northwesterly direction, 225 feet, and thence to the northeast. Complainant's proposed line of division upon the northeast almost entirely cuts off this frontage of the C. I. M. Co. Another complication results from the fact that the C. I. M. Co. is the owner of a small piece of land in the southwest corner of the southeast quarter of section 10, which is 100 feet in length on the section line.

No fixed rule ever has been or ever can be laid down for the division of the territory covered by these inland lakes, with their irregular shores. Each case must depend upon its own peculiar circumstances and facts, and as reasonable a division arrived at as possible.

The manner in which the equitable center was established in this case appears from the testimony of one of complainant's own witnesses, Mr. Bradt, an engineer:

" Q. How did you locate your center point in the lake? What guided you?

"A. I refer you to Mr. Clark, our attorney.

" Q. What did he tell you to do to find that center point?

"A. He didn't tell me to find it; he found it himself.

" Q. How did he find it?

"A. You will have to ask him.

" Q. What did he tell you about that point? What information did he give you?

"A. He simply asked me to compute courses and distances that would converge at a point that he selected and designated.

" Q. Did he tell you the angle to make?

"A. No, sir.

" Q. Now, I wish you would give us just what Mr. Clark gave to you as a basis from which you did that work.

"A. Mr. Clark located upon the map a point that might be considered the equitable center, and I was, from that point, to compute courses and distances from the section line which would converge or meet at that point."

This same witness also admits that the apportionment on his diagram deprives the C. I. M. Co. of any frontage on the southwest shore of lot 7.

The above statement is sufficient to show the difficulty in making an equitable apportionment, and while nothing was said during the negotiations leading up to the agreement, or in the agreement itself, in regard to the difficulty, it may have had much to do in the minds of the officers and agents of the respective parties in fixing the terms of that agreement. That contract was a deliberate settlement of the boundary line between the lands of the three

companies, and was so understood. It was of the utmost importance to these parties that the boundary line be settled beyond any possible doubt. Complainant had discovered a mine on its territory south of the line, and extending under an arm of the lake. At that time it was the only one which it was known would be benefited by the removal of the water. No ore of sufficient value to mine had been found under the lake north of the line. After the removal of the water would come extensive and very expensive explorations, to determine whether there existed under the bed of the lake ore worth mining. The contract, if valid, established the line beyond dispute.

The first obstacle for the complainant to remove, before resorting to an equitable apportionment, is this contract, recognized as valid and acted upon for nearly five years by all the parties. It attempts to do this by asserting that in making that contract it relied upon the case of *Clute* v. *Fisher*, 65 Mich. 48, as establishing the rule that the territory should be divided by the government lines, and that it rested upon that case as the established law until the decision of *Grand Rapids Ice & Coal Co.* v. *South Grand Rapids Ice & Coal Co.*, 102 Mich. 227 (25 L. R. A. 815, 47 Am. St. Rep. 516 ), claiming that the latter overruled the former, and that in making that contract there was a mutual mistake which entitles it to the relief prayed. The former case was decided in February, 1887, and the latter in September, 1894. This claim depends upon the testimony of Mr. Kidder, the superintendent of complainant. He testified that, upon learning of the decision in *Clute* v. *Fisher*, he obtained the opinion of Mr. Clark, its attorney, to the effect that the decision established the rule that the government lines controlled; that he thereupon removed some of the buildings which complainant had erected on land made by it north of the section line on the southwest quarter; that he learned of the decision in *Grand Rapids Ice & Coal Co.* v. *South Grand Rapids Ice & Coal Co.* in the last of December, 1895; that he then applied to Mr. Clark for his opinion, which he received February 8, 1896.

Still complainant waited nearly nine months before assert-
ing title contrary to that defined by the contract.   Upon
this subject Mr. Kidder further testified:

"I accepted Mr. Clark's opinion as final on the subject,
so far as to govern my actions.   I understood it to be only
a matter of opinion.   I understood it to be his opinion, but
that the decision was definite by the Supreme Court.

"*Q.* So long as the matter remained in an opinion, it
was a matter of doubt, wasn't it?

"*A.* Yes.

"*Q.* You were also aware of the fact that the courts
sometimes change their opinions, were you not?

"*A.* I have very frequently thought that, with reference
to this very thing, the Supreme Court might change some-
time.

"*Q.* And rather than investigate any further, or raise
any question about it, you concluded to accept the opinion
as rendered by Mr. Clark.   Is that it?

"*A.* Yes; that is so."

In *Clute* v. *Fisher* the lake contained 32.68 acres.
Plaintiff owned about three-fourths of the frontage.   De-
fendant owned no land fronting upon it, but claimed that
the title was in the State.   The question of the division
of the lake was not involved.   The place where the ice
was cut was conceded to be in territory owned by the
plaintiff, unless his title was limited to the meander line.
A diagram of that lake is found in 102 Mich. 231, and the
issue clearly stated in the opinion of Chief Justice
McGrath.   An examination of the briefs shows that the
question of a division among the riparian owners was not
mentioned.   That part of the opinion was therefore mere
*dicta*, and was an erroneous statement of the law, as
was subsequently held in the case between the ice com-
panies.   The mere *dicta* in the opinions of courts are not
controlling.   It may, however, be conceded that the state-
ment of the learned justice who wrote the opinion, which
was concurred in by the entire court, might fairly be
considered as enunciating the law in this State applicable
to inland lakes of such size, while it also recognized the
correct rule in larger lakes.   The Supreme Court of the

United States so accepted it, as is evident by their reference to it in *Hardin* v. *Jordan*, 140 U. S. 398.

We will first discuss and dispose of the question raised upon the theory that complainant relied upon the decision of *Clute* v. *Fisher* as an authoritative enunciation of the law in its negotiations and contract with the defendants, and that all the parties so understood it. The following, then, is the situation: We find that the parties, in reliance upon that case, entered into a deliberate contract establishing their boundary lines and determining the amount of territory belonging to each. Complainant made the contract with knowledge that it gained territory south of the line, known to be valuable, while it surrendered territory north of the line, not then known to possess any value. All parties are chargeable with knowledge that each was to incur risks of its own, make its own expenditures upon its own land according to the agreement, and, by reason of its expenditures and improvements, would be placed in such a position that it could not be restored to its former *status quo*. The anticipated result came. The explorations, expenditures, and improvements were made, each company making them at its own risk. It is impossible to restore the *status quo* or to render exact justice between the parties, because the *data* are not in existence. It is doubtful if a result approximately correct could be reached upon an accounting. It would be impossible to determine its correctness, within many thousands of dollars. The result of complainant's contention would be that, whenever any case had been overruled, every transaction or agreement based upon that decision may be set aside by the courts, if not barred by the statute of limitations. The agreements and settlements of parties, made with full knowledge of the facts and in reliance upon the law, ought to be as binding as the judgment of the court in a particular case. If ten other similar suits had been pending when *Clute* v. *Fisher* was decided, and judgments had been rendered in reliance upon that decision, the courts could not now set them aside. The law is not

so unstable as to permit such results. Judgments rendered and contracts made upon the faith of the law as enunciated in the decision of a court, in the absence of fraud or misrepresentation, must stand. When that decision is overruled, the overruling decision controls only subsequent transactions. Such is the rule recognized by the decisions and text-writers.

"The general rule certainly is (as has been very clearly stated by the Supreme Court of the United States) that a mistake of the law is not a ground for reforming a deed founded on such a mistake; and, whatever exceptions there may be to this rule, they are not only few in number, but they will be found to have something peculiar in their character, and to involve other elements of decision." 1 Story, Eq. Jur. § 116.

"Upon a close survey, many, although not all, of the cases in the latter predicament will be found to have turned, not upon the consideration of a mere mistake of law, stripped of all other circumstances, but upon an admixture of other ingredients, going to establish misrepresentation, imposition, undue confidence, undue influence, mental imbecility, or that sort of surprise which equity uniformly regards as a just foundation for relief." Id. § 120. See, also, Id. § 128.

Kent, the learned chancellor, said:

"A subsequent decision of a higher court, in a different case, giving a different exposition of a point of law from the one declared and known when a settlement between parties takes place, cannot have a retrospective effect and overturn such settlement. The courts do not undertake to relieve parties from their acts and deeds fairly done on a full knowledge of facts, though under a mistake of the law. Every man is to be charged, at his peril, with a knowledge of the law. There is no other principle which is safe and practicable in the common intercourse of mankind. And to permit a subsequent judicial decision in any one given case, on a point of law, to open or annul everything that has been done in other cases of the like kind, for years before, under a different understanding of the law, would lead to the most mischievous consequences. Fortunately for the peace and happiness of society, there is no such pernicious precedent to be found. This case, therefore, is to be decided according to the existing state

of things when the settlement in question took place." *Lyon* v. *Richmond*, 2 Johns. Ch. 51.

An examination of the cases cited by complainant's counsel will show that there were other considerations in them besides a naked mistake of law. To analyze them would make this opinion unnecessarily long. A brief reference to two will suffice. In *Whelen's Appeal*, 70 Pa. St. 410, there existed a failure to furnish evidence for which the applicant called and to which she was entitled. The court refers to the well-settled principle, and says:

"This doctrine, though founded on principle and supported by authority, will not be allowed to bar the way to relief, where the party seeking to avoid the consequences of his own deed shows that he has acted upon a want of proper knowledge, which he was not able to obtain, though vigilant and diligent in his search for it, or where information to which he was entitled, and which was necessary to the formation of a correct judgment as to the performance of a proposed act by which his rights are to be affected, has been withheld from or refused to him. * * * It is clearly settled that where, with a mistake in law, there is found mixed up other ingredients, showing misrepresentations, stating that which is not true, or concealing that which ought to have been made known; where imposition, undue influence, mental incapacity, or surprise are established,—relief will be afforded to one who has thus been imposed upon and induced to do that which it is contrary to equity to maintain."

In *Blakeman* v. *Blakeman*, 39 Conn. 320, petitioner purchased of defendant land, including a right of way through a lane, and paid a greater price than would have been paid for the land alone. There had been an appurtenant right of way, which had ceased by operation of law. The defendant represented that the way still existed, and would pass by the deed. The court says: "Both parties were mistaken in relation to the fact of the existence of the way,—a mutual mistake."

This case is stripped of all other circumstances. It contains no element of misrepresentation, imposition, suppression, undue influence, undue confidence, imbecility, or

surprise. Neither said or did anything to mislead the others. Each acted with deliberation and with complete knowledge of all the facts. The sole basis of complainant's claim is that the decision of this court, upon the faith of which the contract was made, was subsequently overruled. We recognized the rule in *Ingles* v. *Bryant*, 117 Mich. 113. We declined to reopen a chancery case, where a decree had been entered in this State by mutual consent, upon the faith of a decision of the supreme court of Ohio. Subsequently this court held directly to the contrary. It was decided that the consent decree, acquiesced in for three years, was conclusive upon the parties. Why should not a voluntary settlement out of court be as conclusive as the like settlement made in court? We are therefore of the opinion that this case does not come within any exception to the rule that a mistake of law does not furnish any ground for relief.

Do the contract settling the boundary line, and acquiescence therein, and the acts done thereunder, estop complainant to now assert a different line? The rule is settled by the decisions of this court that, where disputed boundary lines have been established by express agreement, or under such circumstances that an agreement will be implied, and parties have for any considerable time recognized them, they will be upheld, though title by adverse possession could not be maintained. *Joyce* v. *Williams*, 26 Mich. 332; *Smith* v. *Hamilton*, 20 Mich. 433 (4 Am. Rep. 398); *Jones* v. *Pashby*, 67 Mich. 459 (11 Am. St. Rep. 589).

According to the testimony on the part of the complainant, there was a dispute as to the boundary line. Mr. Kidder testified that the superintendent of the C. I. M. Co. asked him for a deed of the land lying north of the section line, and that he for his company declined to give it, making the same claim that he now asserts. If his testimony be true, and for this purpose the company must stand by its own testimony, there was a dispute, and it

was settled by the agreement. Complainant recognized it for nearly five years, and saw all these expenditures made by the defendants without protest.

Complainant, however, invokes the doctrine that title to land cannot rest on estoppel on account of the statute of frauds, and that a vote of three-fifths of the entire stock of the company is essential, under the statute, to convey title. The obvious reply to the first proposition is that it is also established that the statute of frauds does not apply to boundary lines, and that the doctrine of estoppel will be applied to the voluntary adjustment of disputed boundaries. *Hayes* v. *Livingston*, 34 Mich. 384. Under the theory of complainant, corporations could not settle boundary lines without a meeting of the stockholders called to pass upon the alienation of its lands, and the doctrine of estoppel could never be applied to a boundary line between corporations or between a corporation and an individual.

So, too, in reply to the second proposition, it may be said that the statute does not apply to the voluntary adjustment of these lines, but to alienation by deed of conveyance. Complainant was not alienating, dividing, or selling any of its real estate, within the language of the statute. 1 How. Stat. § 4052. "Alienation" means, in law, a transfer of title by conveyance. Webst. Dict.; Cent. Dict. The C. I. M. Co. claimed title by virtue of the original patent. Complainant owned no specific piece of land north of the section line, even under its own theory, which could be measured by metes and bounds. How much, if any, it owned could only be determined by agreement or the decree of a court of equity. If it surrendered land north of the line, it gained other on the south. There was no such alienation of lands as required the vote of the stockholders.

The contract was the act of the three parties to it. It was introduced by the complainant as a valid contract. It was executed with all the formalities of a deed. It had the seal of the corporation. Complainant, as well as the

defendants, paid out large sums of money under it. All are now estopped to deny its due execution and validity.

Another singular result of complainant's contention is this: The annulment of the pumping contract, and the substitution by the court of another in its stead. Courts may annul contracts for fraud or mistake, but they cannot make and substitute others. Complainant did not offer by its bill to have the court fix its proportion of the cost of pumping out the water and mud from the lake, nor define its position upon the contract. Upon the hearing, and after proofs were in, it asked to have the court virtually set the contract aside, and make another one for the parties. The contract was a continuing one, and provided for the continuance of the drainage. Can a court of equity make an agreement for the parties requiring them to keep the water of this lake pumped out, and fix the amount each shall pay, upon a basis which neither contemplated or assented to? Would the parties originally have entered into a contract such as the complainant now asks to be made? In the summer of 1893 the parties disagreed as to the continued liability under that clause of the contract relating to the drainage, and a claim was made against the complainant. Its superintendent replied to this claim by stating that it was under no circumstances interested in pumping out the mud, and that, had such a contingency been stated in the contract, it would not have become a party to it. If complainant would not then tolerate a change in the contract contrary to its understanding, upon what reason can it now ask the court to make one for its benefit, contrary to the express terms of the one the parties made? The court must either affirm the contract *in toto* or wholly set it aside. The foundation of the contract was the settlement of the boundary lines, and the division of the territory and apportionment of expense in accordance therewith. The court cannot set it aside as to the boundary lines, and reform or remake it upon an equitable division of the territory. If set aside, the contract is at an end, and the lake must be left to fill

up, if either refuses to enter into a new contract. The L. S. I. Co. has discovered no valuable ore. It was willing to assume risks in the hope of finding ore. Though it has found none, it does not seek to avoid its agreement. To that agreement alone it can be held.

Complainant is entirely without equity. It doubted the correctness of the rule of *Clute* v. *Fisher*, and thought that a different rule might some time prevail. It was then its duty to take steps to test the question, before permitting defendants to enter into a contract and explorations involving over $100,000. It should, at least, have informed the defendants of its claim, and given them the opportunity to make a contract with that in view. This claim would not have been heard of unless the C. I. M. Co. had developed a valuable mine. The fact that the venture proved successful after large expenditure creates no equity for this complainant. The skill, energy, and money of that company developed a valuable property. It ought, in justice, to reap the benefit, and the complainant ought to be estopped to participate in the benefit, unless an unbending rule of law prevents. *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 592; *Clegg* v. *Edmondson*, 8 De Gex, M. & G. 787. It would not have offered to bear its share of the loss if unsuccessful, nor could it have been compelled to.

Furthermore, it was guilty of laches in keeping silence when it ought to have spoken. Every one is presumed to know the law. Therefore it must be presumed to have known of the law enunciated in *Grand Rapids Ice & Coal Co.* v. *South Grand Rapids Ice & Coal Co.*, *supra*. It had an able attorney, who keeps well versed in the decisions of the courts of this State. Yet it waited 2½ years before asserting its claim, and still 9 months after obtaining the opinion of its attorney that *Clute* v. *Fisher* was no longer the law. It waited until circumstances and conditions have so changed that it is impossible to restore the *status quo*.

Decree affirmed, with costs.

The other Justices concurred.