## SCHRAM v. LUCKING et al.
### No. 8508.

District Court, E. D. Michigan, S. D.
Jan. 30, 1940.

Robert S. Marx, Carl Runge, and Roy G. Holmes, all of Detroit, Mich., for plaintiff.

Lucking, VanAuken & Sprague, of Detroit, Mich., for defendants.

PICARD, District Judge.

This is an action by the Receiver of First National Bank-Detroit v. William and Dean Lucking, Administrators, with will annexed, of the Estate of Alfred Lucking, and is for the collection of that portion of the assessment levied against the shareholders of First National Bank-Detroit applicable to 200 shares of the capital stock of Detroit Bankers Company owned by said estate. The bill is based on the pleadings and findings of fact in Barbour v. Thomas, 6 Cir., 86 F.2d 510, and the facts need not be repeated here, since the Barbour case is recognized as a "class suit". The answer, however, contains a counter-suit which seeks a set-off against the claim of the Receiver, if the Receiver has one, and recision of the contract whereby defendants exchanged 20 shares of Detroit Trust Company stock for 200 shares of Detroit Bankers Company stock. Defendants specifically ask to have their Trust Company stock returned and damages for the value thereof, which roughly was over $25,000 at the time defendants claim they were induced to part with that stock. Defendants claim that they were mis-led by representations of the officers of the institutions comprising Detroit Bankers Company and that instead of their purchasing stock in a holding company that would have actual ownership,

control and possession of and beneficial interests in the stock of the several unit banks (including First National), they later learned that what they really bought was an interest in the stock of the individual several banks throughout the State of Michigan comprising Detroit Bankers. They claim that had they known the legal effect of what they were doing they never would have parted with their Detroit Trust Company stock and that since 80 percent dividends have been paid by the Receiver to depositors of First National, they should receive at least 80 percent of the value of their Detroit Trust Company stock as of the time they made the exchange in 1930, and the return of that stock. Since the amount here claimed by the Receiver from defendants is $3,719.92, it can readily be seen that if claim of defendants has any basis the Receiver would owe defendants considerable money even after taking off the amount of the assessment. Defendants not only claim a set-off but state they have an actual cause of action arising out of the same transaction and that under Rule 13, 28 U.S.C.A. following section 723c, it is mandatory that they present the same by way of counter-claim at this time since the Receiver has brought suit against them.

Defendants also maintain that in any event they owe the Receiver nothing since the Receiver now has on hand more than sufficient monies to pay off all depositors and that the money which he now seeks to obtain from these stockholders would go towards the payment of interest on deposits, for attorney fees and expenses; that such claims of interest by depositors would be barred by the statute of limitations, which is three years, since this would actually be a suit based on "injuries to property". Defendants also maintain that in this connection the bank is no longer insolvent and the purpose of collecting money from them being as above, the Receiver's suit against them should have been brought within three years from the accrual of said right of action, July 1933.

There are certain dates here that are important. The father of defendants died December, 1929, after most preliminary steps for organization of Detroit Bankers Company had been taken. The sons made the exchange in February 1930 and received 200 shares of Detroit Bankers Company stock for 20 shares of Detroit Trust. From that time until the bank holiday in 1933 they received about $1,600 in divi-

dends. The Barbour v. Thomas test suit was decided in the United States District Court at Detroit in 1934; was appealed to and decided by the Sixth United States Circuit Court, November 11th, 1936, 86 F.2d 510, and certiorari denied by the Supreme Court of the United States shortly thereafter in 1937. 300 U.S. 670, 57 S.Ct. 513, 81 L.Ed. 877. Suit was started against these defendants on August 25th, 1938 within the six year statute of limitations period but outside the three year statute claimed by defendants. In December 1938 defendants filed their answer and counter-claim. At the trial plaintiff moved to dismiss the counter-claim and set-off on the theory that defendants' contention for recision and resultant damages was no defense to an assessment liability, quoting Scott v. Deweese, 181 U.S. 202, 21 S.Ct. 585, 45 L.Ed. 822; Scott v. Latimer, 8 Cir., 89 F. 843, and other cases as authorities; that such counter-claim as set forth by defendants is too vague, uncertain and at times incoherent; that it cannot be ascertained against whom defendants want the recision or who is liable for having induced them to become stockholders in Detroit Bankers; and that in any event, defendants must (under the holding of Oppenheimer v. Harriman National Bank, 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042, decided in 1937) first pay the assessment and then bring an action against the bank itself. Other reasons cited by plaintiff question defendants' good faith in bringing the counter-claim and that the Receiver here is merely acting for the depositors as Trustee in collecting assessments and as such is a different entity or individual than as the Receiver for the bank, liable to be sued.

The court denied plaintiff's motion to dismiss defendants' counter-claim on the following theory which we desire to place here as a matter of record in the event of review. In the Oppenheimer case, supra, it is true that Oppenheimer did pay his assessment before starting action against the bank. In that case Oppenheimer claimed damages and recovered judgment by virtue of mis-representation and fraud on the part of officers and directors of the bank, at the time defendant bank sold him the stock. The Supreme Court of the United States in reversing the Court of Appeals placed the judgment which Oppenheimer had received on the same parity with claims of other unsecured creditors of the receivership estate. Ad-

mittedly in the Oppenheimer case there was payment of the assessment before suit against the bank was instituted. But the decision does not determine that two suits were necessary and the trend of the new rules and courts in general is to discourage separate actions tending towards multiplicity of suits and is now rather partial towards combining in one litigation, wherever possible, for determination, the rights of all parties in one subject matter or arising out of one transaction. This is not only the spirit of Rule 13, but it is also the spirit and intention of Rule 14 where extra parties who might be affected by or have some rights in the litigation are permitted to be joined and brought into the same action, even where jurisdictionally they could not originally have been made defendants in federal court. However, this court believes and so decided that defendants in this action could not question the assessment and gave judgment to Receiver for the full amount of his claim, to-wit $3,719.92. This having been placed on the record, the matter then being already before the court, and the parties being present, this court determined that the only logical and sensible thing to do was to proceed with a hearing on the merits of defendants' counter-claim so that if defendants have a counter-claim they can now receive 80 percent of any judgment they may obtain. This is the amount the Receiver has up to this time paid to depositors of plaintiff bank. That, as a matter of actuality, defendants will receive the difference between the amount owed plaintiff on the assessment and the amount coming to them from the bank by counter-claim is immaterial. This court can see no logic in compelling defendants to start a separate action against plaintiff when plaintiff has already brought them into court, just as long as this court preserves at all times the theory that plaintiff was entitled to its judgment and any claim which defendants might establish was a counter-claim and not an off-set. See, also, Hoffman v. Gleason, Receiver, 6 Cir., 107 F.2d 101, decided January 18, 1940.

Proceeding to hearing on the merits of the counter-claim, this court has waived aside the apparent lack of sufficient allegations set forth in defendants' counter-claim to even establish a cause of action on its face. The new rules are very liberal and although defendants' pleadings apparently lack many essentials, that to say the least are most desirable, we permitted testimony

to be taken. But liberally construing the pleadings and having as liberally permitted practically all evidence submitted to prove the counter-claim this court is unable to follow the reasoning of defendants and is in a dilemma to ascertain just how defendants were injured and by whom. They claim that they were to get stock in a holding company that owned the title to and had a beneficial interest in all stock of the units of the holding company. They say they were under the delusion that the holding company was to be the actual—the real owners of that stock. And they then point out that as a result of a district court decision in 1934 sustained by the circuit court of appeals in 1936 they were in fact the holders of stock in those small units throughout the state comprising Detroit Bankers. Defendants do not deny that in any event they would have been liable for this assessment, but they allege that they were deceived, through a mistake or mis-understanding of law as all the parties understood the transaction differently from what the court finally interpreted their respective rights to be. No overt fraud is charged against anyone or any group, defendants resting their rights to recovery entirely on a "mistake of law".

This court finds that defendants got exactly what they bargained for. Free use was made of the opinion and record of Barbour v. Thomas, 6 Cir., 86 F.2d 510, which is the landmark and all-covering bank case settling many controversial matters both of law and of fact. And scrutinizing the propaganda and literature gotten out by these banks before the holding company was formed or the exchange of trust company stock made by defendants, we can find no mis-representation. Detroit Bankers Company did get the stock of the other banks as the court in the Barbour case, at page 513, of 86 F.2d, said: "Since the holding company had no substantial assets *except the stock of its units.*" (Italics ours) And Detroit Bankers Company to all intents and purposes was the real party in interest and the real owner of the stock interests in the individual units. However, it was recognized by all parties that when it came to the matter of assessment there could be no circumvention of the law that would exempt stockholders of Detroit Bankers Company from the double liability clauses of both national and state laws. The attention of every stockholder was directed to this by paragraph IX (a) on the back of each certificate. Every stockholder knew that the Attorney General of the State of Michigan and the Banking Commissioner had insisted that the general public be protected in this manner but in all other respects Detroit Bankers Company owned the stock of these units and there is certainly little equity in defendants' contention that they wouldn't have gone into this transaction if they had known that they were in truth buying direct interests in small banks insofar as assessments are concerned. Defendants were even paid and collected the dividends for three years from Detroit Bankers. They were both lawyers and acquainted with financial affairs in this community. They must have known Detroit Bankers Company had interests in banks throughout Michigan—that only two or three were national banks and the rest state banks. Furthermore if they didn't know what the legal effect of this consolidation and merger of the several banks was to be they certainly learned of it when the United States District Court at Detroit in 1934 ruled that in truth and in fact each stockholder of Detroit Bankers Company was the holder of a proportionate share of the stock of the units comprising Detroit Bankers Company. If defendants had missed such decision at that time there was certainly enough publicity and knowledge as admitted by defendants when the United States Circuit Court of Appeals in Cincinnati sustained the view expressed by the District Court in 1936 in the Barbour case. Yet, nothing was done, no steps to establish a counter-claim by recision were taken by defendants until the present answer and counter-claim in this action filed at least four or four and one-half years after the original bank assessment suit was started in 1933 or '34. This is more than two years, so far as the counter-claim is concerned, after the United States Court of Appeals sustained and affirmed the United States District Court. In addition it must be remembered that defendants appeared as attorneys of record in Ullrich v. Thomas, 6 Cir., 86 F.2d 678, companion to the Barbour suit, and that they intervened in the Barbour case. So they must have known back in '34, at least in '36, all about the legal interpretation placed by the courts on this new bank holding entity. Thus if the statute of limitations is to be applied it could if necessary be invoked against defendants for failure to disavow their agreement within two years after they became aware that a legal fraud had been com-

mitted—not to wait until this late date with the resultant effect of throwing the Barbour decision into reverse if they prevail. Surely if defendants had any rights—which this court denies—they sat upon them. One wonders why this contention was not advanced by defendants in the Barbour or Ullrich cases and why a delay in meeting their own responsibility of assessment after $20,000,000 has already been paid in by other stockholders should be used as a sword to secure benefits to themselves. Then too, if defendants have this right, how can this court do equity to those against whom the statute of limitations has run as to a similar claim. Wouldn't we be putting a premium on delay in meeting one's obligations, or what is worse, might not all stockholders viewing a judgment on this counter-claim—start suit within two years on the theory that they had just learned that there had been a mistake in law recently corrected by this court? What chaos, charges of inequity, uncertainty. and litigation would follow?

But this court further finds that the holding company was the real owner of the bank stock of these individual bank units by every yardstick of ownership that can be applied, except, the one test of which every stockholder was made aware by Art. IX(a) endorsed on the back of every Detroit Bankers Company certificate, to-wit their liability to depositors under the double liability clause. In this connection we direct defendants' attention to Ullrich v. Thomas, 86 F.2d at page 679, where the court states: "Upon this feature it is sufficient to restate our conclusion reached in cases Nos. 7116 and 7117 [the Barbour cases], that the holding company, *as between it* and the creditors and depositors of the bank, was not the real owner of its stock". (Italics ours) In other words, to all other purposes it was the owner, but not *as between it* and the depositors. So this alone is not sufficient to permit defendants to rescind since the back of the certificate received by defendants for their 20 shares of Detroit Trust Company stock challenges their attention to this very exception.

This court further finds that under the law defendants have not even remotely substantiated their right to recision. This court wouldn't know who would be parties to the recision, against whom the recision would run or just what contract would be rescinded, who did the deceiving and who

intended the wrong. Here defendants raise the unique point that everybody was deceived because of a mistake of law and that courts will give equitable relief where two parties enter into a contract under a misconception as to their respective legal rights. Defendants contend that this is a mutual mistake of the law and for that reason the parties should be put in status quo. We are unable to find any authority for this position. In Pittsburgh & L. A. Iron Co. v. Lake Superior Iron Company, 118 Mich. 109, 76 N.W. 395, a Michigan case, the court held that when contracts are made on the strength of what the parties believe the law to be (even if the law then actually is as they believe it to be), but future decisions reverses the law, this is not cause for recision. This court is bound by the Michigan decision but in any event we do not believe that the cases cited by defendants are applicable. Those cases, Philippine Sugar Co. v. Government of Philippine Islands, 247 U.S. 385, 38 S.Ct. 513, 62 L.Ed. 1177; Griswold v. Hazard, 141 U.S. 260, 11 S.Ct. 972, 999, 35 L.Ed. 678; Finance Co. v. Lamson Brothers, 6 Cir., 78 F.2d 515; Cincinnati I. & W. R. Co. v. Indianapolis Union R. Company, 6 Cir., 36 F.2d 323, can easily be distinguished. Here there was a meeting of the minds and we believe an actual understanding that though the ownership was technically in Detroit Bankers, the double liability was always present. It takes no great prophet or diagnostician to foretell that our financial and business affairs would most certainly be in a chaotic state if every time parties found that contracts they had made really meant something else in law this could be ground for recision. There would be absolutely no stability in our public relations at all, business would be stagnate, contracts would be less than scraps of paper and the unscrupulous as well as the honest business man might engage in a wild scramble to control the courts so that he might in time control future decisions affecting existing contracts.

As to defendants' other contention in opposition to this court permitting the Receiver a judgment on the assessment, we find that there is no merit to the same and must refuse to permit testimony to show that today there are sufficient assets on hand to pay all creditors and depositors 100 cents on a dollar. We believe this to be a collateral attack upon comptroller's findings as to insolvency of the bank. We hold the necessity for assessments has al-

754

ready been decided in the following cases: Barbour v. Thomas, 6 Cir., 86 F.2d 510; Crawford v. Gamble, 6 Cir., 57 F.2d 15; Adams v. Nagle, 303 U.S. 532, 58 S.Ct. 687, 82 L.Ed. 999.

Defendants also claim that the statute of limitations furnished another defense to the assessment as plaintiff should have brought this action against defendants within three years. The court finds that even if the evidence had been introduced this would not amount to an action to recover damages for injury to person or property which would bring the action within the three year rule. This is governed we believe by section 13976, C.L.1929 which grants a period of six years in which such cause of action should be brought. If in the future defendants seek to prevent the receiver from paying interest on deposits to depositors, appropriate steps may then be taken by defendants or others who may question that right. It is something that may be settled in the future when the time comes, not by this court now.

For the above reasons we hold that the suit of the receiver for a judgment in the sum of $3,719.92 should stand and defendants' suit for a counter-claim should be denied.

It is so ordered.